THE STATE, Respondent, v. HAYS, Appellant.*

1. It is no ground for the reversal of a judgment of conviction upon an indictment for murder, that the court trying the cause, in empannelling the petit jury, required the State and the defendant to exercise their right of peremptory challenge *at the same time,* by striking from a list of thirty-six jurors the objectionable names, instead of conforming to the usual and better practice of allowing the right to be exercised as each juror was called to be sworn after having been found qualified to serve, the State speaking first and the defendant afterwards; the record not showing that the defendant was prejudiced.

2. Nor is it any ground for a reversal that the attorney general of the state, without the direction of the governor, assisted in the prosecution at the request of the circuit attorney, with the leave of the court, although not required to disclose whether he did so in his official capacity, or received a fee.

3. The Supreme Court will not reverse a judgment of conviction for murder, because the court below rejected evidence of threats made by the deceased against the prisoner, the record not showing whether the threats were recent or of long standing, and it appearing from all the evidence that the prisoner was the aggressor, and had sought the difficulty in which the deceased was killed.

4. Nor will the judgment be reversed for the exclusion of evidence explaining the prisoner's flight, the record not showing that his flight had been proved by the State or relied upon as any evidence of guilt.

5. Although, under our statute, the presumption from proof of the mere fact of killing, without proof of circumstances, is murder in the second degree, yet a case will not be reversed for an instruction that it is murder, without stating the degree, another instruction being given correctly stating what is necessary to constitute murder in the first degree.

*Appeal from Randolph Circuit Court.*

The facts are stated in the opinion of the court.

*J. B. Clark* and *J. Davis,* for appellant, argued the following points :

I. The Circuit Court erred in forcing the defendant to make his peremptory challenges before the State. (R. C. 1845, p. 878–9, § 3, 4 ; 3 Chitty's Practice, 872.)

* This case was decided at the January term of the Supreme Court, and was prepared by Mr. SAM'L A. BENNETT.

II. The defendant ought to have been allowed to prove the threats of the deceased. His defence was, that he killed to save his own life, or to save himself from great personal injury. The threats were material to show that he had good cause for apprehension. (5 Geo. 85 ; 4 Barb. 460 ; 2 Comst. 202, per Bronson, J. ; Whart. Crim. Law, 395 ; 1 Greenl. Ev. § 108 ; 11 Pick. 365.)

III. The defendant ought to have been allowed to prove that he was advised to abscond, to rebut the presumption of guilt from his flight, which had been given in evidence.

IV. The action of the court in permitting the attorney general to appear as counsel for the State in the absence of any authority, is objected to. He could not have been specially employed consistently with the duties of his office, and, under our statute, he had no right to prosecute unless so directed by the governor. At all events, the defendant had the right to have the jury informed whether he appeared as an officer, disinterestedly performing a sworn duty, or for a fee, so that the proper weight might be given to his acts. (R. C. 1845, p. 155, § 2 ; Commonwealth v. Knapp, 10 Pick. 480.)

V. The first, second, third, fourth and ninth instructions given for the State were improper.

VI. The tenth instruction was improper. As all the other instructions had spoken of murder in the first degree, this one left the jury to infer that the presumption from the mere fact of killing was murder in the first degree, and that the burden was on the defendant to reduce the crime below that degree. This is not the law. (State v. Dunn, 18 Mo. 423 ; 2 Grattan, 594 ; Wright, 20 ; 1 McCord, 449 ; 10 Johns. 365 ; 16 Mo. 394 ; 1 Greenl. Ev. § 201.)

VII. The instructions asked by the defendant ought to have been given.

*Gardenhire*, (attorney general,) for the State.

I. The number of challenges to which each party is entitled is regulated by statute, but the manner of making the challenges is left to the direction of the court, and this court will not

interfere with its exercise.  (R. C. 1845, p. 878, 879 ; 16 Mo. 391.)

II.  Brown's threats were properly excluded.  (17 Mo. 544 ; 14 Maine, 248 ; 9 Metc. 110 ; 4 Harrington, 562 ; 4 Iredell, 409 ; Whart. Crim. Law, 234, 235, 289 to 397 and notes.) If, however, the court erred in this matter, it does not affect this case, as the record shows no evidence tending to prove provocation by Brown, or reasonable cause to apprehend personal injury.  The homicide was not brought about by provocation at the time of the act.  (6 Leigh, 791.)  The prisoner's belief as to reasonable cause had nothing to do with it.

III.  Exclusion of evidence that the prisoner was advised to run off was proper under the circumstances of this case.  (21 Wend. 509 ; Whart. Crim. Law, 259, 269.)

IV.  The eighth instruction given for the State was proper. (21 Wend. 550–1.)

V.  The tenth instruction for the State was correct.  (Addison, 255 ; 1 Leigh, 598 ; 6 Rand. 721 ; Wharton, 268 ; 4 Mass. 391 ; 2 Russ. on Crimes, 231 ; 3 Maule & Sel. 15.)

VI.  It was within the discretion of the court below to admit other counsel to aid the circuit attorney in the prosecution, with which this court will not interfere.  (2 New Jersey, 212 ; 14 Ala. 552 ; 18 Conn. 244.)

RYLAND, Judge, delivered the opinion of the court.

At the June term of the Circuit Court, within and for the county of Howard, in the year eighteen hundred and fifty-four, Etheldred J. Hays was indicted for the murder of John W. Brown.  Upon the petition of the defendant, the venue was changed to the Circuit Court of the county of Randolph.  At the May term, 1855, of the Randolph Circuit Court, the trial upon the indictment against the prisoner was had, and the jury found him guilty of murder in the first degree.  He moved for a new trial, which was refused by the court.  He also moved in arrest of judgment, which motion being overruled, he prayed

for an appeal, and the case is brought to this court for revision.

The counsel for the prisoner have made before this court several points upon which they depend for a reversal of the judgment; these points will be noticed in the opinion, though not in the order set forth in the brief of the counsel; yet each point will be observed, as our attention and consideration have been bestowed with much care upon the whole case.

The first point of the defendant's counsel is in regard to the empannelling of the petit jury who tried the case. The bill of exceptions shows that when the cause was taken up for trial, the defendant moved the court to compel the State, by her circuit attorney, to make her peremptory challenges to the panel before the defendant should be compelled to make his peremptory challenges, which the court refused to do, and compelled the defendant to strike from the panel his peremptory challenges, without knowing which of the panel the State would strike off, upon her peremptory challenges, making both parties challenge at the same time, to which opinion the defendant excepted. The record does not show us how this was done. There might have been thirty-six jurors present, free from all objection. Then the State having four peremptory challenges, and the defendant twenty, the remaining twelve would be the jury. If so, the defendant has not been deprived of any advantage or legal right. He has challenged his twenty, but he says he may have challenged some of those who had been challenged by the State, and had he known whom the State would have challenged, it would have given him the power to have challenged others. All this may be so, and still he has lost no right or privilege. He had the thirty-six men from whom his jury were to be selected. The State could refuse four and he twenty. No one of the jurors was put on his panel against his right, nor in violation of his right. Suppose the State's four and his twenty were confined, as it is possible they might be, to the same twenty men, leaving sixteen behind, why then the State has just as much right to complain of having lost her

four challenges, because she did not know those whom he would challenge, as he has. The first twelve then called will make the jury, and the fact that there are sixteen of which to make a jury, instead of twelve, can surely be no deprivation of any right or privilege. We do not think this such an error as would justify the court in reversing. The prisoner does not appear to have been deprived of any legal right. In what order the parties shall exercise this right, is a matter within the discretion of the Circuit Court. The simplest rule upon this subject, and one to which there would seem to be no objection, is that of requiring the parties to challenge as the jurors are called and pronounced qualified, the plaintiff always speaking first. This rule, I believe, has been generally practiced; at least as far as my experience upon the Circuit Court extends, I never knew it deviated from, and that experience embraces a period of eighteen years. But as the rule adopted in this case deprives the prisoner of no legal right, and it does not appear that the discretion was exercised oppressively, it forms no ground for a reversal. The right of peremptory challenges is a right to reject, and not to select a juror. In the case of the United States v. Marchant et al., (4 Mason, 160,) Justice Story said: "The right to challenge for cause is unlimited, but the right of peremptory challenges, without cause, is limited. What is the right of peremptory challenge but a right to exclude from the trial any persons who are disagreeable to the party on trial. Suppose the panel to consist of seventy-two persons and the challenges to be limited to twenty, all that the prisoner can do is to exclude twenty from this list, and it depends altogether upon the order in which the jurors are called, who may be excluded or not. If the prisoner challenge the first twenty who are called, the twelve next called from the remaining fifty-two constitute the jury. It is true, if he chooses to suffer any person to be sworn before he has exhausted his challenges, to that extent he selects his jury; but this is a new incident to his right to exclude jurors to a limited extent, and not the principal object contemplated by the law." Mr. Jus-

tice Blackstone, in his Commentaries, (4 Black. Com. 353,) with his usual perspicacity and accuracy, states the reasons on which the right of peremptory challenge is founded. He says : " In criminal cases, or at least in capital ones, there is, *in favorem vitæ*, allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all, which is called a *peremptory* challenge, a provision full of that tenderness and humanity to prisoners for which our English laws are justly famous. This is grounded on two reasons : 1. As every one must be sensible what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another, and how necessary it is that a prisoner, when put to defend his life, shall have a good opinion of his jury, the want of which might totally disconcert him, the law wills not *that he should be tried by any one man against whom he has conceived a prejudice*, even without being able to assign a reason for his dislike. 2. Because, upon challenge for cause, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke resentment ; to prevent all ill consequences from which, the prisoner is still at liberty, if he pleases, peremptorily to set him aside." Being satisfied, from authority as well as from the reason of the case, that the right of peremptory challenge was given to exclude rather than to select, and the prisoner having exercised that right in this case, we can not see how he has been injured or deprived of his legal rights in the mode adopted in this case for empannelling the jury. We conclude, therefore, that, although the rule, heretofore so long practiced, of requiring the parties to challenge as the juror is called up to be sworn, after having been qualified to serve and so pronounced by the court, the State always to speak first, is the best and least objectionable mode, yet a deviation therefrom, without showing that in consequence thereof the prisoner has been injured, will not authorize a reversal. The point, therefore, is ruled against the prisoner.

State v. Hays.

I will next examine the fourth point made by the defendant's counsel, passing over the second and third for the present. This point is in reference to the appearance and assistance of the attorney general at the trial in the Circuit Court. The record shows that the attorney general of the state, James B. Gardenhire, Esq., assisted the circuit attorney in prosecuting the defendant. The question here is not whether the attorney general would have the right to conduct a public prosecution in a Circuit Court, without an order to that effect from the governor, and against the will of the proper circuit attorney and the court. He claims no such right on this record. Here, it seems, he assisted in the prosecution at the request of the circuit attorney and by permission of the court. Surely, there can be no serious objection to this. But the chief point of objection to his appearance in this case is, because he refused to tell the court and the prisoner's counsel whether he appeared in his official character, merely as attorney general, to assist in the prosecution, or whether he was employed and was to receive pay for his services as a hired counsel. Now we consider the attorney general, as a public officer, had a right to assist the circuit attorney, when requested by him so to do, under leave of the court, whether he had been ordered by the governor or not, and that it was not the business of the prisoner nor his counsel to subject him to the inquiry whether he appeared as employed counsel or in his official character and capacity. If it was improper for him to receive a fee for his services, the presumption is that he did not do it, and it was not for the prisoner to arraign a public officer upon this charge, or to call upon him to purge himself before he was allowed to proceed in the prosecution. It was the duty of the court to see that the prosecution was conducted regularly and without violating any of the rights of the defendant; but it was no part of the prisoner's rights to require of a public officer, appearing in the prosecution, whether he appeared as a public officer, without fee, or as employed counsel. In this case, the prosecution was conducted by the proper public officer, aided by the

attorney general, with the consent of the court. There is nothing in this point. It must be ruled against the defendant.

In order properly to weigh the objections set forth in the second and third points, that is, as to the rejection of the testimony in regard to threats made by deceased against the prisoner, and the rejection of the evidence showing that the prisoner was advised to abscond in order to save himself from mob violence, it will be necessary and proper to state the evidence, which I here set forth at large, as appears from the record.

Charles McNair, sworn as a witness, stated that on the 15th day of March, in the year 1854, Etheldred J. Hays was at the store of Messrs. Lewis & Co., in the city of Glasgow, in Howard county, Missouri, and that whilst the prisoner was in the store, John W. Brown came to the door ; that soon after Brown came, Hays went in the direction of the back room of the store, being a grocery house of near forty feet in length ; that Hays came forward with a common ditcher's spade in his hand, walking on it as if for a staff ; that when out of the door on the pavement or side-walk, Hays stood leaning upon the spade, the shovel end being on the pavement and the handle in his hand ; that Hays took a position near Brown, who was standing near one of the pillars of the door or open end of the house, conversing with some one of the persons present ; that witness saw Hays gradually getting nearer to Brown ; an altercation took place between them ; Brown gave back into the house, and as he went Hays struck him on the head with the spade, knocking him down ; that when Brown fell, he had a pistol in his right hand. Witness took the pistol out of the hand of Brown ; it was a Colt's revolver, with five shooters ; a six inch barrel ; all of the barrels or cavities in the cylinder were loaded with powder and ball, and caps on each of the tubes ; the pistol not cocked, but the hammer resting on the cylinder, between two tubes, from which position witness thinks it could not readily have been cocked without using both hands. M. Hayden was sitting in the room door, and Davis was in the room ; could not hear distinctly the words which passed be-

tween Hays and Brown at the time the difficulty occurred. When Hays came up near to where witness, Brown and others were standing, with the spade in his hand, he made some remark as to the price of spades; witness, at the time Hays was inching up towards Brown, saw Brown's right hand put up to his left breast pocket, and at the time thought that Hays stopped inching nearer to Brown. The pistol now produced looks like the same Brown had in his hand when he fell. At the time Brown was backing into the store-room, witness could not see his face, but could see his hand up to his side breast pocket, and saw his clothing move near the pocket, as if Brown were attempting to draw a pistol. Witness was a clerk in that store at the time. Hay's wagon was in town that day and partly loaded at the store, and had left before the difficulty. Hays was a customer at that store, and had been before Messrs. Perry & Bartholow sold out to Messrs. Lewis & Co. Witness was at the public meeting in Glasgow afterwards, that resolved to offer a reward of five hundred dollars for the apprehension of Hays, after he went off, when bailed out upon the first commitment. Witness afterwards paid five dollars of the reward. A man by the name of Frazier brought Hays back about a week after he left.

Luke F. Hayden then called, swore that on the 15th day of March, A. D. 1854, he was at the store of Lewis & Co., in Glasgow, at the time of the difficulty between Hays and Brown. Witness was sitting in a chair near the door; Hays was at the store when Brown came; Hays came out with the spade, and standing near Brown, kept gradually inching up to Brown. Something was said by one or both of them; thinks Hays gave Brown a slight push with his elbow before he struck him. Brown was retreating into the store at the time Hays struck him with the spade; can not say which, Brown or Hays, spoke the first word at the time of the difficulty; thinks he could have seen Brown if he had drawn a pistol to shoot Hays before he was struck, with the spade. Soon after the blow was struck, Hays had his pocket knife out in front of the store door, talk-

ing boisterously ; said he would like to have another chance at Brown. Before the blow was struck, witness could see both parties ; saw Hays look at Brown sidewise, and thinks he saw Brown look at Hays at or just before the time of the affray ; thinks Brown was standing with his arms folded across his breast, talking with witness about planting hedges ; did not expect any difficulty until he saw the push ; thinks he heard Hays make some remark about being pushed by Brown ; did not hear Hays ask the bystanders if they did not see Brown draw a pistol on him when he had his knife out before the door. Afterwards and while Hays was at the same place, and before he was arrested, heard him say it was strange no one saw Brown draw his pistol on him. Witness and two others first became responsible for the reward of five hundred dollars offered at Glasgow for the apprehension of Hays. Hays was first committed by Esquire F. W. Diggs, then bailed out before the death of Brown, and afterwards the meeting was held in Glasgow. Witness did not sign a call for a public meeting in Glasgow to censure Judge Hill for bailing Hays out, and never was at such meeting ; thinks it was not held.

C. H. Green being sworn, says he was at the place of the difficulty between Hays and Brown on the 15th of March, A. D. 1854 ; he came up and sat on a box or barrel out before the store door, just before Hays struck Brown with the spade : he heard Hays say " don't push me ;" did not hear Brown say any thing. Does not think Hays looked Brown square in the face. Did not see Brown attempt to do any thing before the stroke was made by Hays. Hays was rather between him and Brown, and he could not have seen any attempt of Brown to draw his pistol. When the stroke was given by Hays, and Brown fell, witness went into the room. McNair was trying to get the pistol out of the hand of Brown, which he did, and then set Brown up in a chair. Brown was backing into the house at the time Hays was trying to strike. When Brown received the blow in the head, he rather fell over a chair. When the parties came out before the door and before the difficulty, Hays

was leaning against one of the posts of the door, and he did not see Hays inching towards or close to Brown; believes he did not pay any thing towards the apprehension of Hays. No handbills were printed at the Times office, in Glasgow, offering a reward for Hays. Believes there were some handbills printed at Brunswick, offering five hundred dollars reward for the apprehension of Hays. Thinks Mr. Bartholow telegraphed up there and had them printed; saw one of the handbills at Keytesville afterwards; it had his name to it, proposing that he and sixty others would pay the reward; he never signed it, but after he saw it, he did not repudiate it as his act, but was willing it should stand, as Mr. Bartholow was the agent of Glasgow in that affair. Witness did not sign a call for a public meeting in Glasgow to express public opinion as to Hays' being bailed out.

D. C. Robbins swore that he was a clerk or salesman in the store of Lewis & Co. at the time of the difficulty between Hays and Brown; that at the time Brown came to the door, he (witness) was talking with Hays down towards the other end of the counter, about twenty feet from the door or entrance at which Brown came in view of them. When Brown first came to the door, Hays said "boo!" throwing his hands forward and looking towards Brown; can not say whether Brown saw Hays or not; if seen at all, Brown did not notice the action of Hays. Hays afterwards took up the spade and walked out to the front door; sometime afterwards heard Hays remark, "do you push me, you damned rascal?" "No; you pushed me," was the reply of Brown. Then heard some noise, and Brown fell; could not see the parties at the time. At the time Hays walked forward, with the spade, he made a remark about the price of the spade; but does not know that Hays bought any spade there that day. Witness thinks Hays was fifteen or twenty feet from Brown at the time Brown first came up, when Hays made the first noise at him. At the time of the conversation and the striking, witness was about thirty-five feet from the parties, in the back part of the house. Says Hays had been

drinking, and had free access to the whisky barrel in the back part of the house ; does not know that when Hays said " boo !" he was looking at or meant it for Brown ; but he was looking that way.

M. Cunningham was sworn, and stated that he came up to the spot just as the stroke was made by Hays with the spade on the head of Brown ; did not see what occurred between the parties before the blow; did not see any pistol in Brown's hands ; but heard Hays afterwards ask if none of the crowd saw Brown draw his pistol on him. Hays took out his pocket knife and *cavorted* about the door, saying that he would like to have another chance at him, and by accident or otherwise cut his finger with his knife.

Mr. Kivitt sworn, says : that he was at the store of Lewis & Co. at the time of the affray between Hays and Brown ; had not been there long when Hays said to Brown, " you pushed me." Brown said, " you pushed me." Hays said, " I don't allow you to speak to me." Brown then commenced backing into the store, put his hand in his breast pocket, and taking it out, looked down like he was searching in his bosom for something, and about this time, Hays, stepping briskly forward, struck Brown with the spade the fatal blow on the head. Witness feels certain that at the time Hays struck Brown there was no pistol in Brown's hand. Witness resides in Howard county, about thirty-five miles from Huntsville ; was not summoned till the morning of the day before the one on which he was sworn as a witness in this cause ; conversed with Mr. Bibb about the matter last week. When Hays and Brown spoke to each other, as above stated, they spoke in a loud voice. When Hays commenced raising his spade, Brown was retreating and trying to get something from his pocket, as if trying to draw his pistol at the time of the stroke ; witness was outside of the house, and square out in front of the door.

Dr. J. P. Vaughan swore that he was called to see Brown on the day soon after he was struck by Hays. It was the 15th day of March, 1854 ; the wound was on the left side of the head,

just above the forehead, and the skull was badly broken. Brown was able to speak for about two days after he received the wound. He died about one o'clock on the morning of the 19th day of March, 1854; and he has no doubt he died of the wound. When Brown became speechless, seven or eight physicians were called in and consulted. Brown was then *trepanned*, and the skull was found to be broken and fragments of the inner table or facing were driven into the brain; one piece, nearly as large as a quarter of a dollar, was driven edgewise down into the brain.

Dr. Rucker swore he arrived at the place of difficulty soon after the occurrence; saw Hays out before the store door much excited; had drawn his pocket knife and was showing it, and said he had sharpened it on purpose. When Brown came out of the room, under the care of W. J. Stratton and others, Hays stepped towards him, as if he desired to get at him, upon which Stratton raised his stick and said he would protect Brown. Saw Hays at Diggs' office at the trial; he was much excited and said if that stroke did not kill Brown, he would have another chance at him. Hays said it was just as he wanted it; also asked the crowd, "did you not see the pistol when he drew it on me?" Hays was caught and tied, and so taken to the office of Diggs for trial; can not give an opinion as to whether Hays was intoxicated on that occasion.

A. Boulware sworn: says he was in Glasgow at the time of the difficulty between Hays and Brown; saw some one out of doors taking the spade from Hays, who was making much noise out of doors; saw him have his pocket knife out and open; he said it was as sharp as a razor; told the witness he had sharpened it for that purpose, then told witness about getting the spade, showed him how he had walked out with it, and said, if one lick would not do, two might, and that if Brown had been six inches closer, he would have split his head, and that it was damned strange no one saw the pistol; that Brown had drawn it on him, and that it was cocked.

Mr. Rose sworn, says: on the Monday after Hays was sent

to jail at Fayette, he was at the jail and Hays said he was glad that Brown was not so badly hurt as they had supposed; that if he got well he could have another lick at him. This was early the next morning after Hays was committed, and the news, as to Brown's condition, had been brought in the night by a stage driver. Can't tell why he went to the jail. Witness was one of the guards who helped to take Hays to jail. Witness was one of the men who went to meet Hays when Frazier was bringing him back from Sullivan county; that the crowd said unless Hays went through Glasgow, he would be murdered, and witness told Hays so, and Hays was taken through Glasgow. The company from Glasgow, who went out to meet Hays, was composed of about ten or twelve men. The company met Frazier with Hays east of the Grand Chariton, near the edge of the prairie. It was at the old town of Chariton that they held the consultation about going through Glasgow. There were no relations of Hays living near the road leading past Monticello to Fayette, and he had a relation residing on the one through Glasgow from Chariton; that Hays had many relations between Keytesville and Chariton. They feared a rescue, and met Frazier to aid in guarding prisoner.

Jas. G. Williams being sworn, says : on the day of the affray between Hays and Brown, he saw Hays before the affair happened ; they were standing on or near the corner of Chiles' old stand ; that whilst there, Brown came down the cross street, passing on over to Barton's old stand or corner ; that when Hays saw Brown, he remarked that whenever he saw that thing, it put the devil in him as big as a *ground-hog*, and that he could make a better fight than was ever made in that town. Witness heard Hays say at the trial before Diggs, on the day of the difficulty, that it was very strange no one saw Brown draw his pistol, and this he repeated several times, and also said it was cocked.

Elijah Warden says he was at the speaking at Glasgow in July, 1858 ; knew there were some words between Hays and Brown on that occasion, but does not recollect the particulars.

Witness heard Hays say a few days before the difficulty that he had some money stolen from him, and that he had to pay five or six hundred dollars over it, and that he could wade in his heart's blood; that Hays was drinking and much excited, and that when drinking, he is more excited than other men: he has known Hays about thirty-five years.

Henry Ford, sworn: says he saw Hays at the speaking at Glasgow in 1853; heard him talking about Brown, but heard him make on that day no particular threats; afterwards, in a conversation with Hays, heard him say a great deal about Brown. One thing he recollects: Hays said he could kill Brown like a sheep-killing dog; that he was abusing peddlers; and said he would take his little shot-gun and his boy and stand guard around his premises to keep the peddlers away. Witness heard that Brown had been a book peddler.

Boyd McCrary says he was at the political speaking when it commenced; saw Hays and Brown standing close to each other looking each other in the face. Hays afterwards turned off and said he never would be satisfied till he killed Brown, Harvey and Markland; can not say that Hays was drunk on that occasion; thinks this occurred before the speaking commenced. As Hays turned off, he said something about money being stolen, or having to pay some money, which the witness did not hear distinctly, to which Brown replied it was a damned infernal lie. Don't recollect that Perry Wood and others had to take Hays away from the place of speaking because he was drunk.

Mr. Wagoner sworn: says he was standing on the corner of the street with Williams and Hays, in Glasgow, on the morning of the day the difficulty occurred, and Brown passed along the street in view of them; when, on seeing him, Hays remarked that when he saw that man it made his blood boil.

John Hayden sworn: says he was at the public speaking in Glasgow in July, 1853; saw Hays and Brown there; Hays was talking rough about some one; said he would hurt somebody, but mentioned no one's name; thinks Hays, at the time

he was talking, was within some ten or fifteen feet of Brown; and heard him say also that before he left town he would hurt somebody or they should hurt him. At that time, Hays had out his pocket knife, which he put up soon after. At that time Hays was under the influence of liquor, more or less, and was highly excited from liquor or passion, or both.

Prior Fristoe sworn : says sometime before the difficulty, he being in Glasgow and starting home, when he came near the garden of Brown, where Brown was at work, burying cions, then he discovered in the road the prisoner, down off of his horse, and David Hays and one or two others sitting on their horses. The prisoner was abusing Brown; said to him that he had stolen his money, and if he would come over the fence he would thrash the life out of him; this was the fall before the difficulty between Hays and Brown. Hays said then he would have satisfaction, and also heard Brown tell David Hays to put up his pistol, who replied to Brown he would not.

Tilly Emmerson sworn : says he saw Hays at the garden of Brown as he was on his way passing out of Glasgow homeward, in the fall before the difficulty. Heard either Hays or David Hays, the son of the prisoner, offer Brown fifty dollars if he would come over the fence out of the garden, and that Brown said he would not. At the request of the witness, Hays and his company started on homeward; started to go back, but again went on. Hays was drunk, and some of the party drank some whisky at or near the bridge on the road towards Ben. Lewis'. They also ran a horse race on the public highway, before they got up to Ben. Lewis'.

Benjamin Frazier sworn : says in March, 1854, learning in Milan, Sullivan county, that a reward had been offered for Hays, and that he was seen in that county, he and two others went in pursuit of Hays. When he found Hays, he was riding in a brisk pace along the big road towards Howard county, on a white horse, alone, on a high ridge prairie, where he could be seen for near a mile; that when he met Hays, he asked if Hays was his name? Hays replied it was not; he holding his cocked

pistol in his hand, told Hays he was a damned liar, and to stand still or he would shoot him. Hays then told him his name was Hays and that he was going back. Witness then told him to sit still and not attempt to put his hand in his pocket or saddlebags or he would shoot him; Hays told him he was not armed. When the comrades of witness came up, witness directed them to examine Hays for arms, and they did so, finding only a small pocket knife and a bottle of whisky. Witness did not telegraph from Brunswick to Glasgow that he had caught, and was on the road with, Hays. Was met by a company of ten or twelve men in the night, between Keytesville and old Chariton, and at old Chariton was informed by the company that unless he took Hays through Glasgow he would be taken from him and killed; did so, and was treated well in Glasgow, and furnished a hack to take Hays on to Fayette; next morning returned to Glasgow, and Messrs. Hayden and Green paid him the reward of five hundred dollars.

Here the evidence in chief for the State was closed, and the defendant called as a witness one Joseph Davis, who said, that when Hays was in the store at time of the difficulty, Brown came up to the door, and Hays, when he saw him, said " boo !" at him, throwing his hands forward. Then Hays went to the farther end of the store, took up a spade and made a remark about spades, and walking out of the front door, took his stand on the pavement near Brown, who was standing in the door; then kept gradually getting nearer to Brown; gave him a hunch or push, and, at the same time, exclaimed, " don't push me!" and Brown, stepping back, drew his pistol, and was holding it in both hands as if trying to cock it, at the time, Hays advancing, struck him with the spade, with both hands—the muzzle of the pistol being in the direction of Hays. At the time he struck Brown, witness was out on the pavement in front of the door; stepped to one side at the time the pistol was drawn, and was expecting a difficulty from the looks of Hays. Witness was a clerk in the store of Messrs. Lewis & Co. at that time. Has resided in Glasgow eight or nine years; is about

twenty-one years old now. Does not recollect ever telling Robbins that he did not see the pistol drawn. Robbins asked him some questions about the affair on the morning after it occurred, but witness has no recollection as to what passed between him and Robbins on that subject. The partner of Mr. Dameron, now in Glasgow, is J. C. Mason ; does not recollect of telling Mason he did not see the pistol. Had a conversation with Mason last Sunday night ; has no doubt about having seen Brown draw the pistol as stated.

Mr. Metcalf was then sworn, who stated that when he (the prisoner) and David Hays were coming out of Glasgow, at the time mentioned by Fristoe, the horse the prisoner was riding stumbled, and Brown, who was in his garden, near the place, said, " heads up ! there goes old Dred Hays ;" upon which an altercation commenced between Brown and the prisoner. There was no pistol drawn by any one present. There was another man in the garden ; did not know who he was. They appeared to be setting out young fruit trees. Witness saw no one riding around the house of Brown at the time they were stopped in the road. The prisoner got off his horse, walked up the road quarreling with Brown. Saw no one drink liquor before they got to the bridge or at the bridge, out in the road towards Ben. Lewis' ; nor was there any horse race run in the road by any of the company before they got to Ben. Lewis' ; but had a race on the hill. The prisoner fell off his horse before they got home, three times, from drunkenness ; and that prisoner was much intoxicated.

David Hays sworn : said he was with his father and Metcalf at the time of the quarrel at the garden of Brown ; that his father was very much intoxicated, and that he tried to get him to go along ; that they were starting out of town and the horse his father was riding stumbled, whereupon Brown, who was in his garden, not far off, said, " there goes old drunk Hays," or words to that effect, which being heard by his father, the prisoner, he stopped and got off his horse, and his father and Brown then went to quarreling ; that the witness had with him

an empty pistol that he had got mended that day at the shop for his brother, but he did not draw the pistol while at the garden of Brown ; that a drunken man, by the name of Gibson, went back to Glasgow after liquor from near the bridge towards Ben. Lewis', and that when Gibson overtook them out on the road to Ben. Lewis', he ran his horse up behind them and bantering his father for a race, they two started, galloping their horses along the road till his father fell from his horse ; that he was with his father in Glasgow on the day of the difficulty, and he was driving his father's wagon, which had been taken there for groceries ; that while on his horse to start home with the wagon, and standing before the store door of Lewis & Co., Brown came down the street, and stopping on the pavement, opposite the witness, looked him sternly in the face, which was very unusual for Brown to do ; that at that time his father was in the store, and witness was waiting for him ; that his father was at that time much intoxicated with liquor. Witness was in Glasgow at the speaking in July, 1853 ; his father was much intoxicated on the day of the speaking.

Joel Hume was sworn, and stated that he was at the speaking in July, 1853, at Glasgow, and that prisoner, on that day, was drunk, and acted as a madman ; does not believe that Hays knew what he was doing on that day. (Here the witness spoke of a very indecent act done by Hays, which it is not proper nor important to relate.) Saw Hays in the morning of the speaking, and then saw he was much intoxicated, and then told him he had liquor enough. Witness has lived a neighbor to Hays for many years ; never saw him fall from drunkenness, but has often seen him acting as a crazy man.

John Page sworn : stated that he was at Glasgow on the day mentioned by witnesses, Emerson and Fristoe. Hays, Metcalf, and David Hays overtook the witness about Monticello, and prisoner fell off his horse about the new house of William Hereford, before they got home ; thinks Metcalf and others of the company drank some whisky before they got to the house

of prisoner; there was liquor in the crowd. Hays fell off his horse again going through his own bars.

Here the principal evidence closed.

The prosecution then called Chas. McNair, who swore that he had no distinct recollection as to the position occupied by the witness, Jo. Davis, and others, at the time the fatal blow was struck; but the last place he saw Davis was in the store behind the counter, near a small desk.

Mr. Kevitt re-examined: said when he went into the store of Lewis & Co. a few minutes before the difficulty, Davis was in the store behind the counter, some distance down the room, towards the back part of it; but witness went out of the room a minute or two before the affray; was talking to Arnick and others there, and there was time for Davis to have gone out, but did not see him out on the side-walk or about it.

Mr. Cunningham sworn: says about the time of the difficulty, he saw Davis run down the pavement or side-walk, and go into the second door below, on the same side of the street, as if he were alarmed.

D. C. Robbins being again called, says about one hour after the difficulty, he asked Jo. Davis if he saw the pistol; he said he did not. In a short time thereafter, Dr. J. P. Vaughan having told him that Davis had been telling it two ways, he again asked Davis the same question, telling him what Vaughan had said, and Davis then told him that when the difficulty occurred, he was so scared that he did not know what he saw. On cross-examination, witness says he does not know why he asked Davis the question about the pistol.

Here the prosecution again closed the evidence. Witnesses were then called, who testified to the good character both of Davis and Robbins.

Before the defendant closed his testimony, he offered to prove that Brown, before the day of the fatal affray with Hays, had threatened to shoot Hays, of which Hays had been informed before the difficulty. All of which being objected to by the

prosecution, the court sustained the objection, and refused to permit said evidence to be given to the jury; to which opinion the defendant excepted. The defendant then offered to prove that at the time he left the county of Howard, after being bailed out upon the first commitment, he was advised to do so for a short time, until the excitement was over; and that he was also advised that his life would be in danger from mob violence unless he kept out of the way.

The second point is in relation to the threats of Brown against the defendant. On this subject, the record is very short, and is as follows : "Defendant then offered to prove that Brown, before the day of the fatal affray with Hays, had threatened to shoot Hays, of which Hays had been informed before the difficulty." In a case where threats of the deceased might be used in evidence, this statement would not be considered sufficient to warrant the admission. It is not stated here when the threats were made : whether they were of long standing or of recent existence; for aught that appears, they may have been made months, perhaps years, before, and they may have come to the knowledge of Hays months before, or they may have been very recent. From the record, we can not tell when the threats were made ; whether they were old or recent, or when Hays was first informed of their existence. This might be a sufficient answer to this point, but I will notice it yet further. Here the fact of killing, with all the circumstances, has been clearly proved. Hays, the defendant, has been proved to have manifested a most bitter and revengeful feeling towards his victim ; he says to one of the witnesses " that he never would be satisfied until he killed Brown, Harvey and Markland ;" to another, on the same day on which he inflicted the fatal blow, " that whenever he saw *that thing* (Brown) it put the devil in him as big as a *ground-hog* ;" and to a third, on the same day of the affray on which Brown received his death-blow, Hays said, on seeing Brown passing along the street, " that when he saw that man, it made his blood boil." With this feeling of a heart festering with rancorous hatred towards

Brown, Hays saw Brown standing at the door of a store in which Hays was, and he immediately, on seeing Brown, threw up his hands towards him, with an exclamation; the clerks in the store observed it. He then walked back towards the rear of the store-room, some thirty or forty feet long, and that distance from Brown, picked up a spade, and walked with it out to the front of the store, and stood on the pavement with the spade in his hand. He began gradually to approach his victim, (as the witnesses describe him, *inching up towards* Brown,) and at length nudged him with his elbow, exclaiming at the same time, " do you push me, you damned rascal ?" Brown replied, " no ; you pushed me ;" then Hays struck Brown with the spade, breaking his skull and causing his death in a few days. Brown had a pistol in his hand when he fell ; and one witness says he saw the pistol in the hands of Brown, pointing towards Hays, before Hays struck him. But other witnesses—three or four—did not see any pistol ; and some of the witnesses—two or three—are certain that Brown had not a pistol drawn when Hays struck him. He was talking with one of the witnesses about planting hedges, with his arms folded across his breast, when Hays pushed him. There can not be a rational doubt in the mind of any one acquainted with criminal law and conversant with its administration, that the facts in proof in this case, make the homicide of Brown by Hays murder in the first degree. Here is malice plainly and expressly proved ; here, the weapon is a dangerous one ; here, the blow is given without even an insulting word—not the slightest provocation ; here, the prisoner voluntarily seeks the opportunity ; he takes a dangerous instrument in his hand and walks some thirty or forty feet towards the deceased ; then, with sly and stealthy motion, *inching* up towards his victim, he pushes him, and as his victim is retreating, or giving back into the house, he strikes the fatal blow, and thus takes his life. Upon such a transaction as this, what good to the prisoner would proof of previous threats against him by the deceased have produced ? Could they have changed the facts ? Could they have altered the

routine of events in their melancholy detail? Or would such threats have altered the law? Surely not. The proof of threats made by Brown against Hays, under the circumstances of the killing in this case, as they are set forth in the bill of exceptions, would, in my opinion, have been against the prisoner. It was his duty, if he had known or heard of such threats, to avoid his enemy rather than to have sought him and killed him. Now had Brown attacked Hays, or made efforts to take the advantage of him in a personal difficulty, in such a manner as to cause Hays to believe there was reasonable ground to suppose that Brown meant to do him some great bodily harm, and Hays had, to prevent this, killed Brown, then the proof of previous threats by Brown against Hays would have been proper and highly important testimony, if recently made and known to Hays. But such is not the case here. Brown is attacked by Hays and is slain ; he does not seek the attack, nor does he attempt to defend himself until he sees the instrument of death in Hays' hand raised to take his life. Previous threats are but words, and words are no justification, nor mitigation of murder. " Words of reproach, how grievous soever, are not a provocation sufficient to free the party killing from the guilt of murder ; nor are indecent, provoking actions, or gestures expressive of contempt or reproach, without an assault upon the person." " And it ought to be remembered that in all other cases of homicide, upon slight provocation, if it may be reasonably collected from the weapon made use of, or from any other circumstance, that the party intended to kill or to do some great bodily harm, such homicide will be murder. The mischief done is irreparable, and the outrage is considered as flowing rather from brutal rage or diabolical malignity than from human frailty ; and it is to human frailty, and to that alone, the law indulgeth in every case of felonious homicide." " But in these, and, indeed, in every other case of homicide, upon provocation, how great soever it be, if there is sufficient time for passion to subside, and for reason to interpose, such homicide will be murder." " For, let it be observed, that in all possible

cases, deliberate homicide, upon a principle of revenge, is murder. No man, under the protection of the law, is to be the avenger of his own wrongs." "For he that deliberately seeketh the blood of another upon a private quarrel, acteth in defiance of all laws, human and divine, whatever his motive may be." (Sir Michael Foster's Discourse II of Homicide, ch. 5.)

There are cases in which the threats of the deceased party have been given in evidence; also cases in which such threats have been rejected. But in all such cases, where the threats have been admitted for the defence, they were recent or continued down, so as to become very nearly coeval with the killing, and were brought home to the knowledge of the party slaying. Meade's case is one of those where the threats were admitted in evidence. (1 Lewin's C. C. 184, cited in Roscoe's Crim. Ev. 772, 5th ed., 1854.) In Meade's case, the boatmen, of whom Law, the deceased, seems to have been one, attacked Meade, ducked him, and were in the act of throwing him into the sea, when he was rescued by the police. As Meade was going away, the boatmen threatened him that they would come at night and pull his house down. In the middle of the night, Law and a great number of persons came about Meade's house singing songs of menace, and using violent language. Meade, under an apprehension, as he alledged, that his life and property were in danger, fired a pistol, by which Law, one of the party, was killed. Holroyd, J., among other things, said to the jury, "If you are of opinion that Meade was really attacked, and that Law and his party were on the point of breaking into the house, or likely to do so, and execute the threat of the day before, he was, perhaps, justified in firing as he did." How widely different from this is the case now under our consideration. Meade had been rescued from the hands of a mob, and saved from being drowned. When he was going away, they threatened to pull his house down that night; the mob assembled at night around his house, menacing and using violent language. Now the acts of the mob and the threats of the mob the day before, were proper evidence to explain their intentions

the following night.  The intentions of Law and his party were important matters.  Were they likely to break into the house, or likely to execute their threats of the previous day ?  If so, then the shooting by Meade was justifiable.  Their present conduct was properly to be understood from their past, and from their threats on the day previous.  But suppose Meade had four or five days afterward shot Law and killed him.  Is it pretended that he could give in evidence the threats of the mob when he was rescued by the police ?  Surely not.  How, then, can Hays, who voluntarily and maliciously seeks the life of his victim, expect to justify or palliate his act, by giving evidence that his victim had before threatened to shoot him—threats, from all that appears to the contrary by the record, of long standing.

In Rector's case, (19 Wend. 569,) the counsel for the prisoner offered to prove that the house of the prisoner had been attacked on Saturday night, a week previous to the transaction in which Robert Shepherd was killed by the prisoner, by several persons, and broken into, and the inmates very badly abused, and that they threatened to return some other night, soon after, and break in again, if they were not admitted.  The counsel avowed that this proof was offered to show that the *prisoner had reason to apprehend violence upon his house* at the time that the deceased and his companions came there, and that was his reason for using so much force as he did.  It had been before proved, by a witness for the prisoner, that of those whom they had admitted as guests at the house of the prisoner, some were rioters.  This testimony was rejected by the court.  In the Supreme Court, Justice Cowen, after commenting on Meade's case, says : " The case at bar presents the same circumstance of alarm one step more remote—the assailants not being identified with the previous rioters. That, *per se*, however, would not so absolutely remove apprehension that the killing could not be referred to it.  The jury might have laid no stress upon the circumstance, but I think it should have been received, because we can not say they would not.  The

lightness of a relevant circumstance is no argument for with-holding it from the jury. In the prosecution of a crime so essentially the creature of intent as murder, every thing pertinent should be submitted to the jury upon which they may infer an absence of malice." Brownson, J., said : "It is important here to notice, with accuracy, what facts the prisoner proposed to prove, and the purpose for which the evidence was offered. The bill of exceptions states that an offer was made in the course of the trial to prove that the house of the prisoner had been attacked on Saturday night previous to the transaction in question, by several persons, and broken into, and the inmates badly abused, and that they then threatened to return some other night, soon after, and break in again, if they were not admitted. This was the offer. The purpose for which it was made, as stated in the bill of exceptions, was to show that the prisoner had reason to apprehend violence upon his house at the time that the deceased and his companions came there, and that was the reason for using so much force as he did." The judge then said : " We are referred to Meade's case. There are some very important points of difference between that case and the one at bar." After commenting on the facts of Meade's case at some length, he continues : " In the case at bar, the pretended attack was not made the very next night after the threats of the rioters—a whole week had intervened. The attack was not made by a great number of persons. There were only three young men, and the knocking or kicking at the door for admittance was probably nothing more than the prisoner had been accustomed to hear, without any apprehension for the safety of his person or property. But what is very material, there was no offer to prove that either of the three young men was of the party which had committed the riot, or had any connection or acquaintance whatever with the rioters. Nor was there any offer to show that the prisoner supposed or believed, or had any reason to suspect or believe, that either of these three men had any thing to do with the previous disturbance or the threatened assault on his house. There was no

State v. Hays.

suggestion that either the rioters or the young men were stran-
gers to the prisoners.  So far as the offer goes, he may have
known very well that the deceased and his companions had no-
thing to do with the previous disturbance.   Surely, there is no-
thing in Meade's case to warrant the admission of such evi-
dence as the prisoner proposed to give.   Had the evidence been
received, it would have furnished no just ground for the infer-
ence that the previous riot was at all in the mind of the pris-
oner at the time he made the attack.   It was a mere after-
thought—an attempt to get up and distract the minds of the
jury with a collateral question, foreign to the point in issue."
After some further comments, the judge said:  "It seems im-
possible to maintain that the evidence was admissible.   The
facts, if proved, would not furnish even a colorable pretence
for the attack on the deceased.   Although it is never necessa-
ry that the evidence offered should be conclusive, it is always
essential that it should have a direct tendency to establish the
point in controversy.   A different rule would lead to the most
mischievous consequences in the trial by jury."   Nelson, chief
justice, said:  "If I had been sitting upon the trial, I would
have admitted the evidence, though I can not but see, looking
at the whole evidence, that it could not possibly have had much,
if any, influence upon the minds of the jury.   If the new trial
turned upon it, I might hesitate before granting it."   A new
trial was granted, but not upon this point—principally on ano-
ther and different ground.   In these cases, it will be observed
that the prisoners, Meade and Rector, did not seek the persons
killed.   They were each in his own house — the mob came
to them.   They were at home.   They manifested no design nor
disposition to bring on the attack.   Such is not Hays' conduct.
He saw Brown at the front of the store, and he prepared him-
self for taking his life.   He does not even pretend that he was
apprehensive of an attack from Brown.   He does not avow, as
Rector's counsel did, that he was apprehensive of an attack,
and therefore used the weapon and the force he did for the pur-
pose of defending himself.   I have not a shadow of doubt that

such evidence would have been rejected by the court in which Meade and Rector were respectively tried, without hesitation.

In the case of Monroe v. State of Georgia, the facts were widely different from the facts in this case. There, the threats against the life of Monroe, coupled with the acts of Macon, were brought down to the time of killing. The deceased, at his death, was armed with a yauger and two pistols : he had been watching and seeking the opportunity to kill Monroe. He had created such a dread of losing life in Monroe's mind, that, although a physician, he was compelled to practice his profession by visiting his patients in the night time. Here, the threats by Macon against Monroe, and the acts of Macon of one continued hostile series down to the death, were important evidence to explain the killing on the part of Monroe. (5 Ga. 85, 135, 136.) In the case from Georgia, Meade's case and Rector's case are quoted and relied on as authority. This kind of evidence is permitted by the court in Georgia, to show the reasonableness of the defendant's fears. In the case from Georgia, the testimony proved a continued series of threats, accompanied by acts of violence from the deceased towards the prisoner, commencing some months previously, and coming down to the time of killing, and all showing a determination on the part of the deceased to take the life of Monroe before the next ensuing term of one of the courts of the county where the transaction happened. I repeat that the case at bar differs widely from the case of Monroe, just cited from 5 Georgia.

The evidence, in criminal and civil cases, depends upon the same rules. There is no difference ; what may be received in the one case may be received in the other, and what is rejected in one ought to be rejected in the other. A fact may be established by the same evidence, whether it is to be followed by a criminal or civil consequence. (Russell on Crimes, book 6, ch. 1, p. 726.) What is done in the heat of blood the law attributes to the infirmity of human nature, and extenuates ; what is done after time for reflection proceeds from the wickedness of the heart, is revenge, and aggravates the deed. This is the

law in civil cases, and evidence is admitted in pursuance thereof. (19 John. 319 ; 1 Mass. 12 ; 10 Conn. 459 ; 1 Bibb, 428 ; 3 Blackf. 219 ; 1 Bald. 58 ; 3 Har. & Johns. 162 ; 9 Mo. 527 ; 17 Mo. 544, 537.)

The bill of exceptions in this case does not make the evidence of the threats even a pretence for the conduct of Hays. There is not the slightest ground to suppose he was laboring under any apprehensions of an attack from his victim. View the whole transaction with an impartial eye, and it becomes impossible to divest onesself of the strong impression that Hays maliciously and revengefully sought this controversy ; prepared for it : he said he had sharpened his knife at home for the very purpose : he was anxious to have another blow at his victim. Can any one suppose that Hays had any apprehensions, any dread of an attack upon him by Brown ? I imagine not. Why, then, offer this evidence of a loose threat, without any date ? It was a mere after-thought, got up to distract the jury with a collateral matter utterly foreign to the issue on trial, and was properly rejected.

The third point made by the counsel for the defendant is, that " the defendant ought to have been allowed to prove that he was advised to abscond, to rebut the presumption of guilt from his flight. His flight was given in evidence to raise that presumption against him, and he ought to be allowed to explain it." In looking over the bill of exceptions, it nowhere appears, except by implication and by indirect evidence, that there was a flight of the defendant. The witnesses speak of a reward being offered, and of Hays being brought back. Witness, Frazier, hearing of the reward, started out in a distant county to find Hays, and saw him riding along the main road, on a high ridge prairie, towards Howard county, the place where the deed was committed. Witness apprehended him, and delivered him up to the jail in Howard county. From the manner the testimony is detailed—no questions nor answers, but one continued narrative by the witnesses, not even broken by cross-examination—it is almost impossible to ascertain how this matter of

flight was first introduced. It appears to have been mentioned as a matter of but little consequence—of but slight importance. It may first have been called out by the defendant's counsel, to show the witnesses' feelings and disposition against the defendant by making them state that they assisted in paying a reward to apprehend Hays. And from the place, in the narrative of Mc-Nair's testimony, where this matter is first mentioned, it is highly probable that such was the fact, that the evidence was first introduced by defendant. But be this as it may, the rejection is not a matter of sufficient weight to authorize this court to reverse. If it were not introduced first by defendant, it surely had little or no effect on the trial. In the nature of the transaction, as it is spread out on the record, it could have had no weight with the jury. It nowhere assumes the importance of a fact to be established by the State. The State offered no direct proof before the jury of this fact. Frazier's testimony does not prove a desire on the part of Hays to escape. When he first saw him, he was riding on a public road, going toward Howard; and, from Frazier's narrative, no jury could presume that Hays' flight was any evidence of guilt. The State stood in no need of such evidence. The fact of killing, the circumstances surrounding the whole transaction, were known. There was no necessity to watch the acts of men after the " deed of dreadful note" had been done to find out the actor. He was already known. Again, if it had been considered necessary by the State, it would have been proved by direct and positive proof—not left to implication. In my opinion, neither the positive direct proof of flight, nor any reasons that could have been produced explanatory of such flight, could have had the least weight on the minds of the jury who tried the case. Then, although if I had been trying the case as judge in the lower court, I might have admitted the testimony ; yet I can not think its rejection had the least injurious effect upon the prisoner. In civil cases, when a fact has been fairly and fully made out by competent testimony, the admission of other evidence, which is not strictly proper and legal, of the same fact, is never regarded as a reason for grant-

ing a new trial. (1 Barbour, 155; 9 Conn. 210.) There nowhere appears in the bill of exceptions that any testimony was admitted against the objections of the prisoner. No evidence of any fact or of any circumstance was admitted to the jury against the prisoner's objections. His only complaint on this subject is, that he was not permitted to give evidence, on his part, of the threats, and of the advice and counsel to abscond in order to save himself from mob violence. Now it is impossible for us to see how this evidence could have changed or alleviated the transaction. The issue was as to the prisoner's guilt or innocence of the murder of Brown. The bloody deed, with all the attendant circumstances, was in evidence before the jury, and the matters which were rejected were not, in their nature, calculated to explain the deed. The guilt of the prisoner was most clearly and satisfactorily made out, and would, in all human probability, have been just as plain had the offered evidence been admitted. We can not see how the evidence could possibly have changed the result. The rejection did not injure the prisoner; it did not change or affect in the least the act of killing; it did not explain it. It was not the design to explain it. I am unable to point out any witness who was called directly to testify to the fact of Hays' absconding. There may have been such; but all the testimony on that point for the State does not weigh and should not weigh the value of a feather in the process of finding out the prisoner's guilt; and all the explanatory evidence would be equally useless and futile. The prisoner, so far as regards the points relied on by his counsel for reversal, already noticed in this opinion, has no cause to complain of the inferior court. His trial has been fair, and his case, so far, fairly put to the jury, and there is no room for a reasonable doubt as to the correctness of the verdict.

In the case of the State v. Ford, (3 Strobh. 517, in note,) the Court of Appeals of South Carolina held that if a prisoner's guilt be clearly made out by proper evidence, in such a way as to leave no doubt in the mind of a rea-

21—VOL. XXIII.

sonable man, his conviction ought not to be set aside because some other evidence was received which ought not to have been. O'Neal, J., after speaking of the rule that, where the prisoner's guilt is clearly made out by proper evidence in such a way as to leave no doubt in the mind of a reasonable man, says : " This rule is, I know, to be tenderly and cautiously applied, and I would be the last man on earth to apply it, where there was room to doubt. But when I know the prisoner's guilt is as plainly made out by the other evidence as it is possible to be done, I should feel that I was literally straining at a gnat, while in fact I was swallowing a camel, if I hesitated to apply it to this case."

If there was a motion for a new trial in a civil case upon such ground as this point rests upon in this case now before us, it would not bear discussion. (Smith v. Kerr, 1 Barb. 155 ; Stiles v. Tilford, 10 Wend. 338 ; Prince v. Shepperd & Ropes, 9 Pick. 176 ; Branch v. Doane, 17 Conn. 403 ; Landon v. Humphrey, 9 Conn. 209 ; Fitch v. Chapman, 10 Conn. 8.) But here there is no pretence that any improper evidence was admitted against the prisoner, and I really think there is but as slight pretence that any proper evidence for him was rejected. This point is therefore ruled against the prisoner. The remaining points will be discussed together. They refer to the instructions given and refused in the case.

The instructions given for the State as well as those given for the prisoner, and also those asked for by him and refused, are as follows: For the State. " 1. If, in the month of March, 1854, and in Howard county, the defendant wilfully, deliberately and premeditatedly killed John W. Brown with a spade, the jury must find him guilty of murder in the first degree. 2. If the killing was done as stated in the first instruction, it is no excuse that the defendant was intoxicated or under the influence of liquor at the time, and the killing, in such case, is still murder in the first degree ; for it is a settled principle of law that drunkenness is no excuse for crime. 3. If the defendant, with a spade in his hand, took a position near Brown and

gradually approached him and pushed him, for the purpose of inducing an altercation and getting a chance to kill him, and commenced raising his spade at the same time Brown commenced drawing his pistol, and then struck him and killed him, he is guilty of murder in the first degree ; and in such case, it would be no defence even if the evidence showed that Brown drew his pistol before the defendant commenced raising his spade ; for the law will not permit a man thus to induce a provocation, and so take advantage of it.    4.  In considering what defendant said after the fatal act, the jury must consider it all together.    He is entitled to the benefit of what he said for himself, if true, as the State is of any thing he said against himself in any conversation proved by the State.    What he said against himself the law presumes to be true, because against himself ; but what he said for himself, the jury are not bound to believe, because said in a conversation proved by the State ; they may believe or disbelieve it, as it is shown to be true or false by the evidence in the case.    5.  They can not act upon a mere possible doubt.    It must be a reasonable doubt. 6.  Although the jury may believe from the evidence that Brown was attempting to draw his pistol, or had it drawn at the time Hays struck, and that Hays' life or person was in imminent danger, yet, if they further believe that Hays intentionally brought on the difficulty for the purpose of killing Brown, he is still guilty of murder in the first degree.    7.  The deliberation and premeditation necessary to constitute murder in the first degree, may be inferred from the circumstances connected with the killing ; and if they existed for a moment as well as an hour or a day before the killing, it is sufficient.    8.  If defendant, with a spade in his hand, took a position near Brown and gradually approached him and pushed him, as testified to by Davis, and he did this for the purpose of inducing an altercation, as an excuse for killing him, and did kill him with the spade, then, although Brown drew his pistol at the time Hays raised his spade, as testified to by Davis, or even before Hays commenced raising his spade, he is guilty of murder in the first

degree. 9. If Hays, with a spade in his hand, took a position near Brown and gradually approached and pushed him in such a manner as to give Brown reasonable cause to apprehend a design on the part of Hays to do him some great personal injury, and to apprehend that there was imminent danger of such design being accomplished then, he had a right to draw his pistol and even to kill Hays ; and if Hays, under such circumstances, killed Brown, he can not be acquitted. 10. If Hays killed Brown with a spade, the law presumes it is murder, in the absence of proof to the contrary, and it devolves upon the defendant to show, from the evidence in the cause, to the reasonable satisfaction of the jury, that he was guilty of a less crime, or acted in self-defence." All of which instructions on the part of the State were given.

The defendant then asked the court to instruct the jury as follows : " 1. To find the defendant guilty of the charge in the indictment, the jury must believe, and that beyond a reasonable doubt, that the defendant killed John W. Brown feloniously, wilfully, deliberately and premeditatedly, and of his malice aforethought, having, before the act was done, deliberately formed the design to take the life of said Brown. 2. To find the defendant guilty of the charge in the indictment, the jury must believe, beyond a reasonable doubt, that the defendant, before he committed the act, formed a deliberate intention to kill Brown, and that there was deliberate malice in the act, or circumstances of cruelty and malice, carrying in them the plain indications of a depraved, wicked and malignant spirit. 3. The law presumes that the defendant is innocent of the crime charged against him, and the jury must find him not guilty, unless they believe, beyond a reasonable doubt, that he is guilty ; and if the jury have a reasonable doubt of his guilt, they are bound to find him not guilty. 4. To find the defendant guilty of the charge in the indictment, the jury must believe, beyond a reasonable doubt, that the defendant killed Brown with a formed design, with deliberation and premeditation, and that this deliberation and premeditation was formed

by Hays before the blow was given. The fact that the killing was malicious and wilful, in the common law sense, is not sufficient. 5. That malice is a necessary ingredient to constitute the crime charged in the indictment, and the State must prove, to the satisfaction of the jury, beyond a reasonable doubt, the malicious intent with which the act was done ; and if the jury have a reasonable doubt of the malicious intent with which the act was done, that doubt must weigh in favor of the prisoner, and unless removed by the State, they must find him not guilty. 6. If the jury believe from the evidence that the defendant killed Brown under circumstances where, by any statute, or by the common law, such killing is excusable or justifiable, then the jury shall return a general verdict of not guilty. 7. That, by the law of the State, the defendant was justifiable in taking the life of Brown, if done in the lawful defence of his person, and there was reasonable cause to apprehend, on the part of Brown, a design to do him some great personal injury, and there was immediate danger of such design being accomplished. 2. If the jury believe from the evidence, that, at the time the defendant struck the deceased, he was in immediate danger of receiving some great injury from Brown, or thought himself so, then he had a right to kill him. 9. If the jury believe from the evidence that the deceased drew a loaded revolver pistol on the defendant, with the design to shoot and kill him, or do him some great personal injury, and there was immediate danger of his such design being carried into execution, then the defendant had the right in law to strike him in the lawful defence of his person. 10. To find the prisoner guilty of murder in the first degree, the jury must believe, and that beyond a reasonable doubt, that the prisoner killed John W. Brown feloniously, wilfully, deliberately and of his malice aforethought, and that before the act was done he had deliberately formed the design to take the life of Brown. 11. To find the defendant guilty of murder in the first degree, the jury must believe, and beyond a reasonable doubt, that the prisoner, before he committed the act, had formed a deliberate intention to kill Brown, and that

there was a deliberate malice in the act, or that there were circumstances of cruelty and malignity, carrying in them the plain indication of a desperate, wicked and malignant spirit. 12. If the jury believe from the evidence that Hays struck Brown with a spade, and that such stroke was in the lawful defence of his own person, and there was reasonable cause to apprehend a design on the part of Brown to do Hays great personal injury, and there was immediate danger of such design being accomplished, they ought to find the defendant not guilty, although they may believe from the evidence that said stroke caused the death of Brown. 13. If Hays, in the lawful defence of his own person, struck and killed Brown, who was at the time attempting to draw from his pocket a loaded pistol to shoot Hays, or do him some great personal injury, and there was immediate danger of such injury being accomplished, then Hays had a right to strike Brown in the necessary defence of himself, unless they believe that Hays, with a design of killing Brown, or doing him some great bodily injury, sought the difficulty, and provoked Brown to draw his pistol. 14. If the jury find from the evidence that Hays, in the lawful defence of himself, gave Brown the blow which caused his death, whilst Brown was attempting to draw a loaded pistol, and there was reasonable cause to apprehend a design on the part of Brown to shoot Hays or do him some great personal injury, and there was immediate danger of such design being accomplished, then Hays had a right to strike Brown in the necessary defence of himself, unless they believe that Hays, with a design of killing Brown, or doing him some great injury, sought the difficulty and provoked Brown to draw his pistol. 15. If the jury entertain a reasonable doubt as to the existence of any fact necessary to constitute the guilt of the prisoner, they are bound to acquit him. 16. That, although the jury may believe the weight of evidence before them is against the innocence of the defendant, yet, unless they are satisfied of his guilt beyond a reasonable doubt, they will find him not guilty. 17. That, in considering the declarations of the defendant, given in evidence,

the jury will take into consideration the time and circumstances under which they were made, and also the condition of the defendant when made. 18. That, although drunkenness is no justification for the killing, yet the jury may take it into consideration in determining the intent of the defendant in doing the act."

Of these instructions, those numbered 1, 2, 4, 5, 6, 7, 8, 9, 11, 12 and 15 were refused by the court, and those numbered 3, 10, 13, 14, 16, 17 and 18 were given.

There is no error, as we conceive, in any of the ten instructions given for the State. The counsel for the prisoner, in their arguments before this court, complained mostly of the 8th and 10th instructions. There is no error in the 8th instruction. The court does not endorse the statement, made by the witness Davis, of the circumstances attending the killing, nor does the court misstate the evidence of the witness Davis, but merely directs the jury as to the law, if the facts be as Davis has stated them. This instruction is unobjectionable. It laid down the law properly, and it does not tend to mislead the jury. The tenth instruction is also literally correct; nor can we see how the jury could be misled by it. If Hays killed Brown with a spade, the law presumes it is murder in the absence of proof to the contrary, and it devolves upon the defendant to show from the evidence in the cause, to the reasonable satisfaction of the jury, that he was guilty of a less crime, or acted in self-defence. Now this is literally correct. The law does presume such killing murder. The court did not fix the degree of murder; it did not say in the first nor second degree; nor is there any reason to suppose that the jury were misled by this instruction. The counsel thinks, as the crime of murder in the first degree had been mentioned all along before by the court, that by saying *murder*, without mentioning any degree, the jury would believe the court meant murder in the first degree; but this is a *non sequitur*. This is not a fair interpretation of the instruction. Although with us the presumption under our statute from such a killing would be mur-

der in the second degree, in accordance with the decisions of the Pennsylvania and Virginia courts, where similar statutes exist, yet it is nevertheless murder. In the case of the State against Dunn (18 Mo. 424), this court said, in speaking of the statute of Pennsylvania defining murder in the first degree, of which our statute is a transcript: " Under that statute it has been held, that, unless the circumstances of malice are proved, the law will presume the unlawful killing murder of the second degree. Under the act, the unlawful killing is presumed to be murder, but not murder in the first degree. Whenever it appears from the whole evidence that the crime was at the moment deliberately or intentionally executed, the killing is murder in the first degree ; as if one, without uttering a word, should strike another on the head with an axe, this would be deemed premeditated violence within our act. It will constitute the offence, if the circumstances of wilfulness and deliberation were proven, although they arose and were generated at the period of the transaction. If the party killing had time to think, and did intend to kill for a minute as well as for an hour or a day, it is a deliberate, wilful and premeditated killing, constituting murder in the first degree. So that, under our statute, there is no foundation for the notion that the crime must have been preconceived sometime before its perpetration." This instruction, then, being taken in connection with the tenth instruction asked for by the prisoner, and given by the court, could not possibly have misled the jury ; but the two put the law of the case properly before the jury, and as favorably for the prisoner as he had a right to ask.

In looking over the record, we find that the 3d, 10th, 13th, 14th, 17th and 18th instructions, asked for by the defendant, were given to the jury ; and when we compare these instructions with those given for the State, and then look into the statement of facts in evidence, we can not but see that the law of the case was as fairly and favorably laid down for the defendant before the jury, as he had a right to ask and demand from the court. The counsel for the prisoner, in asking some

of his instructions, evidently overlooked the law concerning malice. I shall not notice each instruction refused. It is not important to do so. If we find the law of the case fairly and plainly set before the jury, although some other instructions which were refused might lawfully have been given, still we will not reverse for that. This is the general course of proceeding in this court. But as to the law of malice, I deem it important to offer a few observations. Malice, in its proper or legal sense, is different from that sense which it bears in common speech. In common acceptation it signifies desire of revenge, or a settled anger against a particular person. But this is not the legal sense. Lord Holt says upon this subject: " Some have been led into mistakes by not well considering what the passion of malice is; they have construed it to be a rancor of mind, lodged in the person killing for some considerable time before the commission of the fact, which is a mistake arising from the not well distinguishing between *hatred* and *malice*. *Envy, hatred,* and *malice,* are three distinct passions of the mind. (Kel. 127.) Amongst us, malice is a term of law importing directly wickedness, and excluding a just cause or excuse. Where the question of malice has arisen in case of homicide, the matter for consideration has been whether the act was done with or without just cause or excuse. Malice, in its legal sense, denotes a wrongful act, done intentionally, without just cause or excuse. It is not, as in ordinary speech, only an expression of hatred and ill-will to an individual, but means any wicked or mischievous intention of the mind. Thus, in the crime of murder, which is always stated in the indictment to be committed with malice aforethought, it is not necessary, to support such indictment, to show that the prisoner had any enmity to the deceased; nor would proof of absence of ill-will furnish the accused any defence, when it is proved that the act of killing was intentional, and done without any justifiable cause." (Rex v. Harvey, 2 B. & C. 268; McPherson v. Daniels, 10 B. & C. 272; Archb. Crim. Pract. 213.) Such is the definition of malice by the English

courts.   Mr. Justice Bayley, in Brumage v. Prosser, (4 Barn. & Cres. 255,) said : " Malice, in common acceptation, means ill-will against a person ; but, in its legal sense, means a wrongful act, done intentionally, without just cause or excuse.   If I give a perfect stranger a blow, likely to produce death, I do it of malice, because I do it intentionally, and without just cause or excuse.   If I maim cattle, without knowing whose they are ; if I poison a fishery, without knowing the owner, I do it of malice, because it is a wrongful act, and done intentionally."

In Commonwealth v. York, (9 Met. 93,) Ch. Justice Shaw lays down the same doctrine.   "A sane man is a voluntary agent, acting upon motives, and must be presumed to contemplate and intend the necessary, natural and probable consequences of his own acts.   If, therefore, one voluntarily or wilfully does an act which has a direct tendency to destroy another's life, the natural and necessary conclusion from the act is, that he intended so to destroy such person's life.   So, if the direct tendency of the wilful act is to do another some great bodily harm, and death, in fact, follows as a natural and probable consequence of the act, it is presumed that he intended such consequence, and he must stand legally responsible for it.   So, where a dangerous and deadly weapon is used with violence upon the person of another, as this has a direct tendency to destroy life, or do some great bodily harm to the person assailed, the intention to take life, or do him some great bodily harm, is a necessary conclusion from the act."   " But however suddenly any act is done, the intent to do it precedes the doing of it, and the act is done in pursuance of the intent and formed design.   However short the interval, the intent necessarily precedes.   This is manifest from the ordinary case of a blow given with a deadly weapon immediately upon the words of provocation.   Words, however aggravating, not being considered a sufficient provocation to extenuate the offence to manslaughter, it is universally held murder — an act done with malice prepense ; and it is not the less preconceived, because the act immediately followed the guilty intent."

In looking over the whole case, the facts plainly show a most deliberate and wilful killing—plainly show a previous state of bitter hatred towards the deceased by the prisoner — plainly show a voluntary and unnecessary attack, with a deadly weapon, without provocation or excuse ; and that the homicide is the result of a violent and cruel act, instigated by a morbid desire for revenge, the offspring of a heart regardless of social duty, and fatally bent on mischief. The trial has been fairly conducted—the law properly laid down to the jury—the evidence given without objection—the grounds for reversal urged before us unsubstantial and unsatisfactory ; there remains nothing further than for the law to take its course.

Judge Leonard concurring, the judgment below is affirmed ; Judge Scott dissenting.