JOHN W. HARDIN *v.* THE STATE.

1. PENDENCY OF FORMER INDICTMENT. — To an indictment for murder the accused pleaded in abatement that a previous indictment for the same offense was still pending against him. *Held,* not a good plea.

2. JURY — SPECIAL VENIRE. — In organizing a jury from a special *venire,* after the State had examined the jurors touching their qualifications, the accused was required, if he desired to cross-examine them, to do so before the State accepted or rejected them. *Held,* that this practice was not in violation of law or prejudicial to any right of the accused.

3. MUTUAL AMENABILITY OF JOINT OFFENDERS. — Note in the opinion a

charge to a jury in a murder case which is held a correct exposition of the law controlling the amenability of each joint offender for the acts of his confederates.

4. Charge of the Court. — On his trial for murder 'the accused asked the court to instruct the jury that his character had not been put in issue, and, therefore, in making up their verdict they should not be influenced by any supposed character of him. *Held*, not error to refuse such an instruction when there was no evidence to which it could apply other than his own boasts proved as part of the *res gestæ*.

5. Evidence — Flight. — It is competent for the State to prove that the accused fled after the commission of the offense. The case of *Williams* v. *The State*, 43 Texas, 182, is overruled in so far as it limits such proof to cases of circumstantial evidence.

6. Murder. — The Code of this state has not abrogated the requirement of the common law that in murder cases it is necessary to allege and to prove that death resulted from the injury within a year and a day. The following allegation sufficiently complies with this requirement: "Giving the said W., then and there, two mortal wounds, of which mortal wounds so given as aforesaid the said W. did instantly die."

Appeal from the District Court of Comanche. Tried below before the Hon. J. R. Fleming.

Though yet a young man, the appellant, John Wesley Hardin, has succeeded in achieving a remarkable and widespread reputation for sanguinary deeds. For years during the era of civil disorganization which succeeded the war between the states, he and his "gang" were the terror of whole communities in different sections of western Texas, and the law long proved impotent to arrest their career, or afford protection to those who had incurred their easily-earned animosity. Finally, however, Hardin fled the state for parts which remained unknown until a few months prior to his trial in the present case, when he was brought back from Florida, where he was taken by surprise and apprehended.

After his return to Texas the District Court of Comanche County asserted the earliest demand for his attendance, to answer for the murder of Charles Webb, a deputy sheriff of the adjacent county of Brown, and a man universally

known, and characterized by the witnesses as a "quiet, peaceable man, and a brave and efficient officer."

On May 26, 1874, Webb came to the town of Comanche, the county-seat of Comanche County, and late in the afternoon of the same day he was shot down and killed, in a street near the north-east corner of the public square, and close to an establishment known as "Jack Wright's saloon."

James Carnes, Jr., the first witness for the State, testified that he was standing on the east side of the saloon, and noticed Webb coming around the north-east corner of the building.    John Wesley Hardin and another man were standing near by, and as Webb came round the corner Hardin remarked to his companion, "There comes that d—d Brown County sheriff, now."    Webb came on as if he intended to pass Hardin and enter a side door of the saloon. Just as he was about to pass Hardin the latter stopped him and asked him if he was not the sheriff of Brown County. Webb replied, "No, I am the deputy sheriff."    Hardin then asked him if he had papers for him.    Webb answered that he did not know him, and then Hardin said, "I am that d—d desperado, John Wesley Hardin, as people call me; now you know me."    Webb replied that he had no papers for him.    Hardin then asked Webb what he had in his hand, and Webb answered that he had a cigar in his hand, and showed it.    Hardin then said to Webb, "I have heard that you have said that John Carnes had not done his duty, and was no sheriff."    Webb replied that he had made no such remark; that, so far as he knew, Mr. Carnes did discharge his duty.    Hardin then said, "Your people in Brown County say that John Carnes is no sheriff and no man."    Webb answered that he knew nothing about it, and was not responsible for what the people of Brown County said.    Mr. Thurmond, a lawyer, was standing in the street, at a short distance, and called to Webb, saying, "Charley,

come here." Hardin turned toward Thurmond and said, " I am attending to Charley now." Webb started to move toward Thurmond, and Hardin said to him, " You can't go off from me," or, " You ain't going off from me in that way." Webb then stepped back and said, " No, G—d d—n you, I am not afraid of you," and drew his pistol and fired as soon as he got it out of its scabbard, and before he got it presented. Hardin, James Taylor, and Dixon all fired at Webb, Hardin being in front of him, Taylor to his left, and Dixon to his right. Webb had his back to the saloon, and was pretty close to it. Webb was killed, and as he fell Hardin exclaimed, " Shoot them every d—d one;" and witness ran. Webb fell at the first crack of Hardin's and Taylor's pistols. Witness, before he left, saw Hardin fire two shots at him, and after the firing ceased saw Webb lying in the saloon, dead.

On his cross-examination this witness stated that Hardin and Webb fired very close together. But he could not say that the former had his hand on his pistol when the latter fired. When Webb fell, he laid his pistol on his knee and fired again.

Henry Carnes, the second witness for the State, gave a very similar account of the rencounter down to the shooting. But he said, " They all then drew their pistols, and all fired at once, or nearly so. If there was any difference, Webb fired first; there was very little difference, if any; they all fired in an instant." This witness knew Hardin previously. In talking to Webb, he spoke in a loud tone, excited and angry. Webb was very cool and collected, and spoke in a very low tone. Webb was struck in the head, through the abdomen, and on his hand.

Quite a number of other witnesses testified to the incidents of the conflict, concurring in substance with the testimony already related; but the State introduced others, whose evidence reflected a strong light on the case.

William Cunningham testified that, a few days before the homicide, he was at Waldrip's ranch, about ten miles west of the town of Comanche, having been employed by Joe G. Hardin, a brother of the appellant, to go there and get some cattle. There he met John Wesley Hardin, Joe G. Hardin, and six cousins of theirs — Alex Barrickman, Ham Anderson, James Taylor, James Anderson, Bud Dixon, and Tom Dixon. About two weeks previous to this occasion witness was at the same ranch, and was present when Charles Webb, the deceased, came there and arrested a son of old Mrs. Waldrip. While witness and the above-named parties were at supper, Mrs. Waldrip told the crowd that Webb had arrested her son and mistreated her, and if she could she would kill him. Joe G. Hardin replied to her, "We will get away with him for you when we get him to the right place." A great deal of talk ensued about this and other matters. John Wesley Hardin took part in the talk, but witness could not repeat what he said. When Joe G. Hardin made his reply to Mrs. Waldrip, John Wesley Hardin was sitting at the table.

G. W. Talbot testified that on the day of the killing he looked for the appellant for the purpose of collecting a livery-stable bill. Seeing the appellant, in the evening, at the saloon of Carnes & Wilson (some fifty feet west of Wright's), he went over there and entered at the back door. As he passed through, the appellant said to James Taylor, "Jim, old fellow, why didn't you come out to the race to-day? You knew I was expecting a difficulty." Hardin and Taylor then went out at the back door, sat down on a log, and held a long conversation between each other. When they came back into the saloon they were both crying. Hardin treated the party, and then he and the witness went to the front door and stood in it. Webb was walking up the east side of the public square, in the direction of Wright's saloon. Taylor was standing just to the rear of

Hardin, who turned his head in the direction of Webb and then turned back to Taylor, and said, "Did you ever see anything coming up finer in your life?" After this remark, Hardin and Taylor stepped out and went up towards Wright's saloon. Witness remained a few minutes, and then went to his livery-stable, distant 100 or 150 yards, and heard the shooting before he reached there.

It was in proof that Hardin and Taylor mounted horses and made their escape immediately after the difficulty.

The jury found the appellant guilty of murder in the second degree, and assessed his punishment at twenty-five years' confinement in the penitentiary.

*S. H. Renick*, for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

WHITE, J., John Wesley Hardin and one James Taylor were jointly indicted by the grand jury of Comanche County, on October 31, 1874, for the murder of one Charles Webb, in Comanche County, Texas, on May 26, 1874. On September 25, 1877, and whilst the original indictment was still pending, a new indictment was presented by the grand jury of Comanche County against the same defendants for the same identical offense. Upon this second indictment the appellant, Hardin, was alone tried, at the September term, 1877, of the District Court, and was found guilty of murder in the second degree, with twenty-five years imprisonment in the penitentiary affixed as his punishment. From that judgment this appeal is taken. The record, though voluminous, presents but few questions which it is necessary to discuss.

The first is that the court erred in overruling defendant's plea in abatement. This plea in abatement was predicated upon the fact that, another and former indictment having been returned against defendant for the same offense, and

being still pending, the grand jury had no jurisdiction to inquire into and present the second indictment, and that defendant ought not to be held to answer the same. In signing and certifying the bill of exceptions taken to the ruling, the court says: "Which plea the court overruled, on the ground that the first indictment alluded to in said plea had been dismissed as soon as it was reached on the docket, on motion of the district attorney, because the same was defective; and there was, at the time said motion was presented to the court, only one indictment pending against the defendant, John Wesley Hardin, in the District Court of Comanche County."

It is provided by our statute that "the only special pleas which can be heard for the defendant are: (1) that he has been before legally convicted in a court of competent jurisdiction upon the same accusation, after having been tried upon the merits; (2) that he has before been acquitted by a jury of the accusation against him, in a court of competent jurisdiction, whether the acquittal was regular or irregular; (3) that the court before whom he is prosecuted has no jurisdiction to try the cause." Pasc. Dig., art. 2951.

The plea in abatement in this case does not, strictly speaking, come within any of the special pleas thus enumerated. But if it can be so considered, then the plea is not a good one. In *The State* v. *Gut*, 13 Minn. 342, it was held "that it is not a ground for setting aside the indictment that there was another indictment pending in the court against the same person for the same offense, at the time the indictment on which he is arraigned (and which he moves to set aside) was found." And in *Stuart* v. *The Commonwealth*, 28 Gratt. 950, it was held "that the mere pendency of one indictment is no bar to another, even for the same offense; the accused cannot be tried on both, but the commonwealth may elect on which it will proceed."

Mr. Bishop says: "The law is accordingly settled that,

after a man is arrested and discharged by the committing magistrate, or after the grand jury has refused to find an indictment against him, or after he is indicted and even pleaded to the indictment, which is still pending, or after any other proceedings, pending or not, down to the time of trial, he is still for the same offense liable to a new indictment, to which what has been done is no bar. And without prejudice to any such fresh prosecution, the attorney for the State may *nol. pros.*— that is, discontinue — an indictment at any time after it is found, previous to the moment when, the defendant having pleaded — that is, made answer to it — a traverse jury is impaneled and sworn to try the cause." 1 Bishop's Cr. Law, 4th ed., sec. 856; 1 Bishop's Cr. Proc., 2d ed., sec. 770; *Richardson* v. *The State*, 2 Texas Ct. App. 322.

The second bill of exceptions was taken to the ruling of the court with reference to testing the qualifications of the jurors. As stated in the exception, the objection was that, " after each juror had been examined by the State touching his qualifications, and had answered the statutory questions so as, *prima facie*, to qualify himself, the court required the defendant, if he desired to cross-examine such juror touching his qualifications, to do so before the State had accepted or rejected him." No authority is cited by counsel in support of this objection, and we imagine none can be found; nor can we imagine how any injustice could possibly accrue to defendant from such a requirement.

Our statutes provide the qualifications, and also what will disqualify parties as jurors, in all cases. Acts Fifteenth Legislature, 78, 82, secs. 1, 26. See, also, Pasc. Dig., art. 3041. The object of these provisions was to secure good, fair, and impartial juries in all cases, and especially in criminal cases. It is also further provided by statute that, "in forming the jury, the names of the persons summoned shall be called in the order they stand upon the list, and, if pres-

ent, shall be tried as to their qualifications, and, unless challenged, shall be impaneled." Pasc. Dig., art. 3024. And again : " The court is the judge, after proper examination, of the qualifications of a juror." Pasc. Dig., art. 3044. This clearly confers upon the court the authority to see that a proper examination is had of the qualification of the juror, and it is a duty no less than an authority. Any method not violative of the statutes referred to, and which is calculated thoroughly to test the juror's qualification, in subordination to the legal requirements, is " a proper examination." These provisions quoted from the Digest are " not in conflict with, and have not been repealed by, the 23d — or, indeed, any other — section of the act of 1876." *Taylor* v. *The State*, 3 Texas Ct. App. 169.

The rules with regard to the formation of the jury in capital cases were also discussed by this court in *Swofford* v. *The State*, 3 Texas Ct. App. 76, and *Wasson* v. *The State*, 3 Texas Ct. App. 474. In this latter case it was held that, " in forming a jury from a special *venire*, no objection is perceived to calling several of the *venire* together and swearing them simultaneously to answer questions respecting their qualifications as jurors ; but the questions should be put to them separately and consecutively, and not *en masse*. The first on the list should be first interrogated, and, if found qualified, be accepted or rejected before the next is interrogated ; and in like consecutive manner the others should be examined and passed upon until the jury is formed, or the *venire* is exhausted." The rule as laid down in *Horbach* v. *The State*, 43 Texas, 242, has in each of these decisions, and in subsequent ones by this court, been held to be the correct practice. *Baker* v. *The State*, 3 Texas Ct. App. 525.

We see no error in the method of examination adopted by the court in determining the qualifications of the jurors in this case.

The two subjects above discussed are the only two presented by bills of exception in this transcript, though in the motion for a new trial we find reference made to other bills of exception upon other points, which, if reserved and prepared, are not incorporated in the record, and the reference made to them in the motion is so vague and general that it is impossible for us to determine what they complained of.

The motion for a new trial makes special mention of two of the subdivisions of the charge of the court as being erroneous.    We copy from the motion, as follows:

" 4. The court erred in his sixth instruction to the jury in this : that it assumes as a fact proven that the defendant acted with others in killing the deceased.

" 5. The court erred in his eighth instruction to the jury, because the same authorizes the jury to consider the evidence of an alleged conspiracy between defendant and others, and upon the same to find the guilt of the defendant, without charging that the killing must have been in pursuance of such conspiracy ; and, further, because said instruction authorizes the jury to consider the acts and declarations of alleged conspirators in determining the guilt of the defendant, without charging as to the effect of such acts and declarations on the several degrees of murder."

In response to these objections it is only necessary that we should here copy from the charge those portions, bearing upon the subject-matter of these objections, and then to illustrate its correctness when considered in the light of the well-established principles of law.

The charge is: " 6. The jury are further charged that all persons acting together in the commission of an offense are principal offenders, and in this case, if the jury believe from the evidence that the defendant acted with others in killing the deceased, and that they shot and killed the deceased under the circumstances set forth in the preceding

charge, 5 (which was: "If the jury believe from the evidence that the defendant, John Wesley Hardin, while acting with others, did, at or about the time and at the place alleged in the indictment, with a sedate and deliberate mind and formed design, shoot at and kill the deceased, Webb, you will find the defendant guilty of murder in the first degree"), then he would be guilty as a principal offender, whether his alleged shots took effect on the person of deceased or not.

"7. If the jury believe from the evidence that the defendant, and other parties acting with him, entered into a conspiracy to kill the deceased, Webb, and that in pursuance of this formed design the defendant, and others acting with him, did, at or about the time and at the place alleged in the indictment, shoot and kill the said Webb, you will find the defendant guilty of murder in the first degree.

"8. If the jury believe from the evidence that the State has proven a conspiracy between the defendant, and others acting with him, to take the life of the deceased, and that the defendant, and others acting with him, did so take the life of the deceased, then you are charged that, in considering the guilt or innocence of the defendant, you may take into consideration every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, which has been given in evidence before you.

"9. A conspiracy is a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means."

From the quotations it will be seen that the objection made to the sixth charge as above stated is not founded in fact. And the correctness of the other portions of the charge is well established upon principle and authority. Mr. Phillips, in his standard work on Evidence, says:

"It is an established rule that when several persons are proved to have combined together for the same illegal purpose, any act done by one of the party in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of the law, the act of the whole party." Ph. on Ev., 5th ed., 168.

Proof of the plot or combination must precede proof of declarations made by either of the conspirators, though the conduct, acts, and declarations of separate parties in the planning or execution of the scheme may be shown as evidence of the common design." *The State* v. *Simmons*, 4 Strobh. 266; *Regina* v. *Mears*, 1 Eng. Law & Eq. Rep. 581; *The State* v. *Ripley*, 31 Me. 386; *Glory* v. *The State*, 13 Ark. 236.

The same rules are laid down by Mr. Greenleaf in his celebrated work on Evidence. See 1 Greenl. on Ev., sec. 111. And he says in another portion of his work, treating directly upon the law of conspiracy: "The *principle* on which *the acts and declarations of other conspirators*, and acts done at different times, are admitted in evidence against the persons prosecuted is that, by the act of conspiring together, the conspirators have jointly assumed to themselves the attribute of individuality so far as regards the prosecution of the common design; thus rendering whatever is done or said by any one in furtherance of that design a part of the *res gestœ*, and, therefore, the act of all." 3 Greenl. on Ev., sec. 94.

" A conspiracy may be proved by circumstantial evidence, and parties performing disconnected overt acts, all contributing to the same result and the consummation of the same offense, may, by the circumstances and their general connection, or otherwise, be satisfactorily shown to be conspirators and confederates in the commission of the offense." *Kelley* v. *The People*, 55 N. Y. 565, reported in 14 Am. Rep. 342.

At the instance of defendant, in addition to the charges above set out, the court gave the following special instruc-

tion to the jury, viz. :   " The State having set up a conspiracy between the defendant and others to take the life of Charles Webb, it devolves on her to prove it beyond a reasonable doubt."   These charges, taken together, we think fully presented the law of the case applicable to the conspiracy, and superseded the necessity of any further instructions relative thereto, such as those specially submitted by the defendant.

Nor do we think that the charge is obnoxious to the criticism contained in the sixth ground of the motion for a new trial, in this :  " that it gave undue prominence to the proposition that if the defendant provoked the difficulty with Webb with the view of killing him, he would be thereby precluded from asserting the law of self-defense."   This was made a prominent, if not the most prominent, and salient feature of the case, as shown by the evidence adduced on the trial, and one which should have been kept prominently before the minds of the jury in considering the different aspects in which the testimony was to be weighed.   Pasc. Dig., art. 2260 ;  *Crane* v. *The State*, 41 Texas, 494 ;  *Pugh* v. *The State*, 2 Texas Ct. App. 539 ;  1 Bishop's Cr. Law, secs. 715, 716 ;  *The State* v. *Hayes*, 23 Mo. 287.

The fourth instruction asked for defendant, and refused by the court, was  " that the defendant's character has not been put in issue in this case, and the jury are instructed that, in making up their verdict, they are to be governed by the law and the testimony exclusively, without reference to any supposed character of the defendant."   We cannot imagine to what portion of the evidence this instruction could be held applicable, or upon which it was predicated, unless it was to a remark made by defendant himself to Webb, just before the killing, when Webb told him that he did not know who he (defendant) was ; to which defendant replied, plied, " I am John Wesley Hardin, that d—d desperado, as people call me ; I am considered an outlaw, but I always carry the documents with me that will protect me."   We

see no other evidence of defendant's character being introduced, or sought to be introduced, on the trial.    So far as his own declarations as to who and what he was are concerned, they were a part of the *res gestæ* — a character which he declared and proclaimed for himself at the time, as is shown by six witnesses, and that, too, in a boastful, braggadocio manner.    If the character which he gave of himself, under such circumstances, was hurtful to him, he cannot be heard to complain.    The evidence was legitimate, and he made no motion to have it stricken out; and, had he done so, the court would have been fully authorized in overruling such motion.

Again, it is contended that the court should not have permitted evidence of defendant's flight immediately after the homicide to go to the jury, and in support of this position we are cited to the case of *Williams* v. *The State*, 43 Texas, 182, in which the doctrine is enunciated that such evidence is only legal and permissible in cases of circumstantial evidence.    The case of *Williams* v. *The State* was reviewed by this court, and the authorities cited by the learned judge examined, and, upon mature consideration, it was held that the rule therein laid down was not supported. That case will, therefore, be considered hereafter as overruled. *Blake* v. *The State*, 3 Texas Ct. App. 581 ; Whart. Cr. Law, sec. 714.

We have reserved for the last subject of discussion the motion in arrest of judgment, that being the most important question raised upon the trial, and the one which has here been insisted upon with great earnestness in the brief and oral argument of the learned counsel for the appellant. The motion in arrest is as follows, viz.:

"1. That the indictment nowhere charges that the deceased, Charles Webb, died in Comanche County.

"2. There is no allegation that the deceased, Charles Webb, died in the state of Texas.

"3. Because the indictment does not charge that the of-

fense of murder was committed in Comanche County, nor in the state of Texas.

"4. Because the indictment does not charge that the offense of which the defendant was found guilty by the jury was committed within the state of Texas, nor does it state where the offense was committed."

It is unnecessary to copy the indictment in full; suffice it to say that in its formal parts it follows the approved precedents, and is sufficient. The motion in arrest has reference solely to the averment alleging the death, which we here insert: "The said John Wesley Hardin and James Taylor, with the leaden bullets aforesaid, out of the pistols aforesaid, by the said John Wesley Hardin and James Taylor discharged and shot off as aforesaid, then and there, unlawfully, willfully, feloniously, and of their malice aforethought, did strike, penetrate, and wound the said Charles Webb, in and upon the head and in and upon the abdomen of the said Charles Webb, giving to the said Charles Webb, *then and there*, two mortal wounds, of which mortal wounds *so given as aforesaid* the said Charles Webb *did instantly die*."

It is contended that the words "*did instantly die*," instead of the words "did *then and there* instantly die," do not sufficiently or with certainty allege either the time or the place of the death.

It cannot be denied that even under our perfect and complete system of criminal law there are many rules of procedure unprovided for, which necessitates a recourse to the common law. Pasc. Dig., art. 2493. But our Code has accomplished much for reform and improvement in the administration of criminal law. The design of its enactment was "to define in plain language every offense against the laws of this state, and affix to each offense its proper punishment." Pasc. Dig., art. 1603. It provides that "this Code, and every other law upon the subject of crime

VOL. IV. — 24

which may be enacted, shall be construed according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects; and no person shall be punished for an offense which is not made penal by the plain import of the words of the law." Pasc. Dig., art 1611.

Again, it is stated that " the provisions of this Code shall be liberally construed, so as to attain the objects intended by the Legislature — the prevention, suppression, and punishment of crime." Pasc. Dig., art. 2491.

Our Code of Criminal Procedure also lays down and prescribes the requisites of an indictment. Pasc. Dig., arts. 2863, 2864, 2865.

Notwithstanding these provisions of our criminal law, it is undeniably true that they have not altered or in anywise changed the fundamental rule of the common law that, to make the offense of murder in the first degree, it is necessary to allege, and necessary to prove, the death, and that the deceased literally died within a year and a day after he received the injury of the wounds which occasioned the death. 1 Hawk. P. C., ch. 23, sec. 90; 2 Hale, 179; 2 Chitty's Cr. Law, 737.

It is contended that the indictment in this case does not make this allegation, and counsel cite us to a number of authorities, the leading one of which is *Lester* v. *The State*, 9 Mo. 666, in which case it was held that the words " instantly did die " do not sufficiently charge time and place. We are also referred to *The State* v. *Sides*, 64 Mo. 383.

In *Lester* v. *The State* the allegation was, "And with a large stick, of no value, which he, the said Lester, in both the hands of him, the said Lester, then and there had and held, him, the said Scott, in and upon the head of him, the said Scott, feloniously, willfully, and of his malice aforethought, and by laying in wait, did strike and beat, giving

him, the said Scott, by such striking and beating, divers mortal bruises and contusions, in and upon the head of him, the said Scott, of which said mortal bruises and contusions he, the said Scott, did instantly die." In the case of Sides, the allegation was that the deceased " did immediately languish, and, languishing, did die."

As was held, and we think correctly, in neither of these indictments do the allegations show when and where deceased died. And so, it has been held that the word " *immediately* " is too uncertain an allegation when time constitutes part of the offense. 1 Bishop's Cr. Proc., 2d ed., sec. 409. " But," says the same learned author, " when the time and place have been sufficiently set out in the indictment, if, then, it becomes necessary to repeat them, this may be done, and it usually is, by the use of the words "then and there." 1 Bishop's Cr. Proc., 2d ed., sec. 407. This court, in *Harris* v. *The State*, 2 Texas Ct. App. 102, held that under the Code an indictment for theft need not, in charging the intent to defraud and the intent to appropriate, aver the time and place separately to each intent; that the copulative conjunction " and " suffices, without reiterating " then and there."

When the indictment in this case is carefully scrutinized, it will be found that none of the cases cited, and no authority invoked, is in point. The words are, " giving to the said Charles Webb, *then and there*, two mortal wounds, of which mortal wounds so given [given when? why, " then and there "] as aforesaid [to what does " as aforesaid " allude if not to the wounds given " then and there " ?] the said Charles Webb did instantly die." We can scarcely conceive how the addition of the words " then and there," before the words " did instantly die," could have made the language more certain than it is. Their addition, as the sentence is constructed, would have been simply tautology.

The indictment is, in our opinion, sufficiently certain in

the allegation of the time and place of the death; and, taken as a whole, is a good indictment for murder in the first degree. We have already had occasion to notice the charge of the court as to some of its particulars. Taken as a whole, it was a most well-conceived and well-expressed exposition of the law applicable to the case.

It only remains for us to pass upon the sufficiency of the evidence; and when we consider it as it appears in this record, we can but conclude that the life of the deceased — " a quiet, peaceable man, and a brave and efficient officer," who was an entire stranger to defendant and the other two murderers who aided and assisted him in the killing — was taken without provocation, in cold blood, with premeditation, and in pursuance of a diabolical conspiracy, concocted and agreed upon several days prior to the homicide. Under all the circumstances as detailed in the evidence before us, defendant could have had no other motive in beginning and urging on the difficulty with deceased than that of killing, or having him killed by his confederates, the two dastardly and inhuman assassins who aided him in the accomplishment of the foul deed.

We see no error for which the case should be reversed, and the judgment is, therefore, in all things affirmed.

*Affirmed.*